# Illinois Official Reports

## Supreme Court

---

### *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951

---

| | |
|---|---|
| Caption in Supreme Court: | GARY L. BOGENBERGER, Appellant, v. PI KAPPA ALPHA CORPORATION, INC., *et al.*, Appellees. |
| Docket Nos. | 120951, 120967, 120986 cons. |
| Filed | January 19, 2018 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Kathy M. Flanagan, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. <br> Circuit court judgment affirmed in part and reversed in part. <br> Cause remanded. |
| Counsel on Appeal | Law Offices of Michael W. Rathsack, of Chicago (Michael W. Rathsack and Peter R. Coladarci, of counsel), for appellant and cross-appellee. <br><br> Eric W. Moch and Robert E. Elworth, of HeplerBroom, LLC, of Chicago, for appellees and cross-appellants Pi Kappa Alpha Corporation, Inc., and Pi Kappa Alpha International Fraternity. <br><br> Daniel J. Nolan and Elizabeth M. Bartolucci, of O'Hagan Meyer LLC, of Chicago, for appellees Alyssa Allegretti *et al.* |

Michael C. Borders and Rosa M. Tumialán, of Dykema Gossett PLLC, of Chicago, for cross-appellant Alexander Jandick.

Robert K. Scott, of Scott Halsted & Babetch, P.C., of Chicago, for cross-appellant Steven A. Libert.

Michael Resis, of SmithAmundsen LLC, of Chicago, for cross-appellants Thomas F. Costello *et al.*

Thomas W. Starck and Cathleen M. Hobson, of Law Offices of Meachum, Boyle & Trafman, of Chicago, for cross-appellant Andrew W. Bouleanu.

Ray H. Rittenhouse, of Mulherin, Rehfeldt & Varchetto, P.C., of Wheaton, for cross-appellant David R. Sailer.

John B. Higgins, of Higgins & Burke P.C., of St. Charles, for cross-appellant Andres J. Jiminez Jr.

George K. Flynn and Paul V. Esposito, of Clausen Miller P.C., of Chicago, for cross-appellant Isaiah Lott.

Kevin J. Caplis, of Querrey & Harrow Ltd., of Chicago, for cross-appellant John Wallace.

Mark Le Fevour, of ML Le Fevour & Associates, Ltd., of Burr Ridge, for cross-appellant Daniel Post.

Eileen M. Letts, of Zuber Lawler & Del Duca LLP, of Chicago, for cross-appellant Michael J. Phillip Jr.

Timothy Palumbo, of Kopka, Pinkus & Dolan P.C., of Chicago, for cross-appellant Patrick W. Merrill.

Tom Cameli and Stephen M. Brandenburg, of Cameli & Hoag, P.C., of Chicago, for cross-appellant Daniel Biagini.

Douglas J. Esp and Benjamin J. Thomas, of Esp Kreuzer Cores LLP, of Wheaton, for cross-appellant Estefan A. Diaz.

Anthony Todd Schneider, of Law Offices of Capuani & Schneider, of Chicago, for cross-appellant Nicolas Sutor.

John S. Huntley and Renee Ziolkowski, of Sanchez Daniels & Hoffman LLP, of Chicago, for cross-appellant Jonathan Hutchinson.

David H. Wolfe and Patrick R. Grady, of Wolfe & Jacobson, Ltd., of Chicago, for cross-appellant Russell P. Coyner.

Mark B. Ruda, of Condon & Cook, LLC, of Chicago, for cross-appellant Omar Salameh.

Christopher P. Leritz, of Leritz, Plunkert & Bruning, PC, of St. Louis, Missouri, for cross-appellant James P. Harvey.

David Koppelman and Joseph A. Bosco, of LaRose & Bosco, Ltd., of Chicago, for cross-appellant Alexander Renn.

Michael Malatesta, of Malatesta Law Offices LLC, of Chicago, for cross-appellant Nsenzi K. Salasini.

Brian G. White, of Ripes, Nelson, Baggot & Kalobratsos, PC, of Chicago, for cross-appellant Gregory Petryka.

Colin H. Dunn, of Clifford Law Offices, P.C., of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Justices

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Justices Thomas, Garman, and Burke concurred in the judgment and opinion.

Chief Justice Karmeier concurred in part and dissented in part, with opinion.

Justice Theis concurred in part and dissented in part, with opinion, joined by Justice Kilbride.

**OPINION**

¶ 1    David Bogenberger attended a pledge event at the Pi Kappa Alpha fraternity house at Northern Illinois University, where an evening of vodka-laden hazing ensued. By the end of the night, his blood alcohol level would reach more than five times the legal limit. David lost consciousness and died during the night.

¶ 2    At issue here is whether plaintiff's complaint alleged a cause of action for negligence against defendants, who included the fraternity's national organizations; the local chapter and its officers, pledge board members, and active members; and certain nonmember sorority women. The circuit court of Cook County dismissed the complaint in its entirety pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2014)). The appellate court affirmed in part, reversed in part, and remanded for further proceedings. 2016 IL App (1st) 150128, ¶ 51. The court affirmed the dismissal of the complaint as to the fraternity's national organizations and the nonmember sorority women. *Id.* ¶¶ 11, 51. The court reversed the dismissal as to the local chapter and its officers, pledge board members, and active members. *Id.*

¶ 3    For the following reasons, we affirm the dismissal of the fraternity's national organizations. We affirm the reversal of the dismissal of the local chapter and its officers, pledge board members, and active members. We reverse the dismissal of the nonmember sorority women. The cause is remanded to the circuit court for further proceedings.

¶ 4                              BACKGROUND

¶ 5    In the fall of 2012, David began his freshman year at Northern Illinois University in DeKalb, Illinois. He became a prospective pledge of the Eta Nu chapter of Pi Kappa Alpha fraternity (NIU Chapter). As a prospective pledge, he was required to attend a pledge event called "Mom and Dad's Night." A day or two prior to the event, a plan for the night was approved and adopted by certain unknown NIU Chapter officers, pledge board members, and active members. The plan designated seven rooms in the fraternity house to which two or three "Greek couples" would be assigned. The members were directed to obtain vodka for the pledges to consume during the event and to contact sorority women to serve as "Greek Mothers." Each member would select a pledge for whom he and a sorority woman would serve as the pledge's "Greek Mother and Father." Couples were to ask the pledges various questions and give them a specific amount of alcohol, regardless of their answers. Pledges would be divided into groups of two or three and would rotate from room to room every 10 minutes. The plan called for most, if not all, pledges to become unconscious. Certain areas of the house were designated as places where pledges could "pass out." Pledges would be checked periodically, and their heads and bodies would be positioned in such a way so that if they vomited, they would not choke. Officers kept Breathalyzers and would use them to measure the pledges' blood alcohol level.

¶ 6    Members informed the pledges of the "Mom and Dad's Night" event, which would be held on November 1, 2012. They also indicated that attendance was mandatory and that the pledges would be required to drink excessive amounts of alcohol during the event. The pledges believed that attending and participating in the event was a required condition to gaining

membership in the fraternity. The pledge event was not registered with the university as required by the university's policy.

¶ 7    As directed, David and the other pledges arrived at the fraternity house at 7:30 p.m. for "Mom and Dad's Night." They were divided into groups of two or three and given a list of rooms in the house to which they were to proceed, in a designated order, every 10 minutes. Each pledge was given a four-ounce plastic cup to bring with him from room to room, where it was filled with vodka by the members and the sorority women. The pledges were asked questions by the "Greek couples" and tried to determine whether the couples were their "Greek parents." They were directed and required to consume the vodka in their cups based on their answers. If pledges were reluctant to drink, they were called derogatory names by the couples. When a pledge asked a couple whether they were his Greek parents, he was told they were not, even when they were, and he was required to drink another four-ounce cup of vodka. Over the course of about an hour and a half, each pledge, including David, had consumed three to five cups of vodka in each room. The pledges, who could no longer walk without assistance, were taken to the basement and told the identity of their Greek parents and were given T-shirts and pledge paddles. They were also given "vomit buckets" that had been decorated by the women. As pledges began to lose consciousness, they were brought to the previously designated places in the house. David was placed in a bed in his "Greek father's" room by one of the members, who oriented his head and body so that he would not choke if he vomited. At approximately 11 p.m., the NIU Chapter president and an officer sent a text message to other officers and members telling them and the sorority women to delete any pictures or videos they had of a "passed out" pledge. Throughout the night, pledges were occasionally checked and adjusted so that they would not choke if they vomited. Members discussed whether to obtain medical attention for the pledges but decided not to and told others not to call 911 or seek medical care for them. Sometime during the night, David died. His blood alcohol level was 0.43 mg/dl. As a result of the pledge event, the NIU Chapter's charter was suspended and ultimately revoked.

¶ 8    Plaintiff, Gary L. Bogenberger, as special administrator of David's estate, filed a 12-count, fifth amended complaint for negligence against defendants on May 28, 2014. Defendants are the Pi Kappa Alpha national organizations, the NIU Chapter, the officers and pledge board members individually and in their official capacities, the active members, and the nonmember sorority women.[1] Plaintiff alleged that defendants owed David a duty of reasonable care and sought damages pursuant to the Wrongful Death Act (740 ILCS 180/1 *et seq*. (West 2012)) and the Survival Act (755 ILCS 5/27-6 (West 2012)).

¶ 9    Plaintiff's counsel attached an affidavit to the complaint, averring that many of the allegations in the complaint, especially those made "upon information and belief," were based on counsel's reading of "various summary reports, recorded witness statements and media reports." Counsel also averred that he was unable to initiate discovery of any of the defendants, other than an officer of the Pi Kappa Alpha national organizations, due to the pendency of criminal charges stemming from David's death.

¶ 10    Defendants filed motions to dismiss pursuant to section 2-615 of the Code. All of the motions asserted that plaintiff's complaint failed to allege a duty in light of the case law that

---

[1]The landowner of the fraternity house was also named as a defendant in counts XI and XII but was subsequently dismissed, and plaintiff does not challenge that ruling in this court.

prohibits social host liability with regard to alcohol. They further argued that the complaint failed to allege specific facts to impose a duty with regard to voluntary undertaking, concerted action, or joint liability.

¶ 11     The circuit court granted defendants' motions to dismiss with prejudice and dismissed the complaint. The court noted the decisions in *Quinn v. Sigma Rho Chapter of the Beta Theta Pi Fraternity*, 155 Ill. App. 3d 231 (1987), and *Haben v. Anderson*, 232 Ill. App. 3d 260 (1992), which recognized a cause of action against a fraternity and a university lacrosse club, respectively, where the plaintiffs were required to drink alcohol to the point of intoxication to become a member of the organization. Nevertheless, it questioned the viability of those cases after this court's decisions in *Charles v. Seigfried*, 165 Ill. 2d 482 (1995), and *Wakulich v. Mraz*, 203 Ill. 2d 223 (2003), which declined to create any form of social host liability regarding alcohol consumption. The court further found that even if *Quinn* and *Haben* remained viable, plaintiff's complaint was insufficient because it failed to plead specific facts and the allegations in the complaint were conclusory.

¶ 12     The appellate court affirmed the dismissal of the complaint as to the Pi Kappa Alpha national organizations and the nonmember sorority women. 2016 IL App (1st) 150128, ¶¶ 11, 51. The court reversed the dismissal as to the NIU Chapter, its officers and pledge board members, and the active members. *Id.* Additional pertinent facts will be included in the analysis of the issues reviewed on appeal.

¶ 13                                         ANALYSIS

¶ 14     Plaintiff appeals from the appellate court's judgment and contends that the court erred in affirming the dismissal of the Pi Kappa Alpha national organizations and the nonmember sorority women. Defendants, the NIU Chapter, its officers and pledge board members, and its active members also appeal and contend that the court erred in reversing the dismissal of the complaint as to them. We consolidated the appeals. We also allowed the Illinois Trial Lawyers Association to file an *amicus curiae* brief in support of plaintiff. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 15                                   Social Host Liability

¶ 16     Initially, we address an argument made by all defendants that the rule against social host liability bars plaintiff's claim. Regarding social host liability, we have said, "few rules of law are as clear as that no liability for the sale or gift of alcoholic beverages exists in Illinois outside of the Dramshop Act." *Charles*, 165 Ill. 2d at 490. This rule is based on over a century of precedent. *Wakulich*, 203 Ill. 2d at 229-30. The rationale behind the rule is that the drinking of the intoxicant, not the furnishing of it, is the proximate cause of the intoxication and the resulting injury. *Charles*, 165 Ill. 2d at 486. As a matter of public policy, the furnishing of alcoholic beverages is considered too remote to serve as the proximate cause of the injury. *Id.* As a result, we have declined to impose any form of social host liability for alcohol-related injuries. *Wakulich*, 203 Ill. 2d at 237.

¶ 17     Whether the rule against social host liability applies to the factual situation presented here is a matter of first impression in this court. In *Wakulich*, we noted the appellate court opinions of *Quinn* and *Haben*, which held that the required consumption of alcohol to gain admission into a fraternity and lacrosse club, respectively, were an "exception" to the rule against social

- 6 -

host liability. *Wakulich*, 203 Ill. 2d at 239. We characterized *Quinn* and *Haben* as addressing the "limited situation in which a college fraternity, or similar college organization, requires those seeking membership to engage in illegal and dangerous activities, in violation of the hazing statute." *Id.* at 239-40. Ultimately though, we did not address whether the holdings in *Quinn* and *Haben* were compatible with our rule against social host liability because the plaintiff in *Wakulich* was not involved in a hazing event. *Id.* at 240. We are now confronted with such a factual scenario.

¶ 18    We would be turning a blind eye if we failed to acknowledge the differences between a social host situation and an alcohol-related hazing event. A social host situation involves the sale or gift of alcohol. An alcohol-related hazing event involves the *required* consumption of alcohol in order to gain admission into a school organization in violation of Illinois's hazing statute (720 ILCS 120/5 (West 2010)).[2] We cannot fairly characterize such hazing events as involving the sale or gift of alcohol. This type of hazing does not fit within the social host situation. Alcohol is not merely furnished to an individual; the individual is required to consume alcohol, often at a near-lethal level, to gain admission into a school organization. This required consumption of alcohol is not too remote to serve as the proximate cause of intoxication and the resulting injury. Thus, we find that the rule against social host liability is inapplicable to an alcohol-related hazing event. We caution, though, that our determination here is quite narrow. To reiterate our words from *Wakulich*, our above finding only applies in the limited situation in which the consumption of alcohol is required to gain admission into a school organization in violation of the hazing statute. Nothing more is intended.

¶ 19    Having determined that plaintiff's claim is not barred by the rule against social host liability, we now turn to the general principles of negligence to determine whether plaintiff's complaint alleges a cause of action for negligence.

¶ 20                                    Negligence

¶ 21    Where the plaintiff seeks recovery based on the defendant's alleged negligence, the plaintiff must plead and prove the existence of a duty owed by the defendant, a breach of that duty, and injury proximately resulting from that breach. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12. Defendants' contentions are limited to the question of duty; therefore, our analysis focuses on that element. Whether a duty exists is a question of law for the court to decide. *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280 (2007).

¶ 22    We have long recognized that " 'every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons.' " *Simpkins v. CSX*

---

[2]The hazing statute provides, "[a] person commits hazing when he or she knowingly requires the performance of any act by a student or other person in a school, college, university, or other educational institution of this State, for the purpose of induction or admission into any group, organization, or society associated or connected with that institution, if: (a) the act is not sanctioned or authorized by that educational institution; and (b) the act results in bodily harm to any person." 720 ILCS 120/5 (West 2010). The legislature has recodified this provision since the events at issue but left the substance unchanged. See Pub. Act 97-110 (eff. Jan. 1, 2013) (recodifying 720 ILCS 120/5, 10 as 720 ILCS 5/12C-50).

*Transportation, Inc.*, 2012 IL 110662, ¶ 19 (quoting *Widlowski v. Durkee Foods*, 138 Ill. 2d 369, 373 (1990) (collecting cases)). Thus, where an individual's course of action creates a foreseeable risk of injury, the individual has a duty to protect others from such injury. *Id.* The duty inquiry focuses on whether the plaintiff and the defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990). Whether a duty exists is also an inquiry shaped by public policy. *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 388 (1998). There are four traditional duty factors that guide our analysis: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. *Simpkins*, 2012 IL 110662, ¶ 18.

¶ 23 The question presented by a motion to dismiss a complaint pursuant to section 2-615 of the Code is whether the complaint alleges sufficient facts that, if proved, would entitle the plaintiff to relief. *Charles*, 165 Ill. 2d at 485-86. Such a motion challenges only the legal sufficiency of the complaint. *Wakulich*, 203 Ill. 2d at 228. The critical inquiry is whether the allegations of the complaint, when construed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Id.* In making this determination, all well-pleaded facts in the complaint must be taken as true. *Id.* We review an order granting a section 2-615 motion to dismiss *de novo*. *Id.*

¶ 24 We now consider whether plaintiff's complaint alleged sufficient facts to support his negligence claim. Addressing the counts in the order they appear in the complaint, we first turn to counts I and II, which were directed at the Pi Kappa Alpha national organizations.[3]

¶ 25         Counts I and II—The Pi Kappa Alpha National Organizations

¶ 26 Plaintiff contends that the Pi Kappa Alpha national organizations (Nationals) are vicariously liable for the misconduct of the NIU Chapter and its members because the NIU Chapter and the members were their agents. Plaintiff also contends that the Nationals are directly liable since they owe a duty to the pledges to refrain from encouraging and directing local chapters to engage in hazing.

¶ 27 The Nationals contend that they are not vicariously liable for the NIU Chapter's hazing activities because no agency relationship exists. They also argue that even if this court were to find that an agency relationship exists, the hazing acts of the NIU Chapter and its members were outside the scope of the agency, which defeats a finding of liability. The Nationals further maintain that they are not directly liable and have no duty of care to the pledges of local chapters since they have no day-to-day control over local chapters.

¶ 28 Turning to plaintiff's agency or *respondeat superior* theory of liability, in order to prove that the Nationals are liable for the alleged negligent actions and omissions of the NIU Chapter and its members, plaintiff must prove that the NIU Chapter and the members were their agents. *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 18. A complaint relying on an agency relationship must plead facts that, if proved, could establish the existence of an agency relationship. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 498 (1996). A mere allegation of

---

[3]The Pi Kappa Alpha national organizations are Pi Kappa Alpha International Fraternity and Pi Kappa Alpha Corporation, Inc.

agency is insufficient to establish actual agency. *Id.* Proof of actual agency requires a showing that (1) a principal/agent relationship existed, (2) the principal controlled or had the right to control the conduct of the agent, and (3) the alleged conduct of the agent fell within the scope of the agency. *Wilson*, 2012 IL 112898, ¶ 18.

¶ 29        Counts I and II of plaintiff's complaint are substantively identical, though count I is brought pursuant to the Wrongful Death Act and count II is brought pursuant to the Survival Act. The counts alleged that the Nationals "[t]hrough [their] agents and employees[,] encouraged local chapters, including Eta Nu, to hold events similar to 'Mom and Dad's Night' because they were good for member and pledge retention, therefore increasing revenue and income to the defendants through dues and fees." The complaint also alleged the following. The Nationals were "engaged in the business of organizing, promoting, and recruiting membership" in local chapters and "as further part of their business, supervised, advised, required and controlled the activities and conduct" of their local chapters. The local chapters were required to adhere to the Nationals' fraternity constitution; chapter codes; risk assessment manual; its quarterly publication, *The Shield and Diamond*; and *The Garnet and Gold* pledge manual. These documents included and referenced a hazing policy that prohibited any hazing action as well as hazing that utilized alcohol. The Nationals had the right and the power to "expel, suspend or place restrictive remedial conditions on continued operations of local chapters;" to "assist local chapters in the conduct of rush or pledging activities or require alcohol or hazing education;" to "expel, suspend or place individual members of local chapters on 'alumni status;' " and to "ban and prohibit pledging activities outright at local chapters." The Nationals obtained knowledge about the conduct and operations of local chapters through the reports from chapter consultants who conducted on-site, weeklong assessments of the chapters. The consultants analyzed each chapter's recruitment performance, continuing risk awareness education, alumni relations, finances, housing, management, athletics, scholarship, campus involvement, community service, and public relations. The Nationals knew, through their consultants' reports, that for at least three years prior to David's death, the NIU Chapter did not provide continuing risk education to members, did not have a risk awareness program, had no written crisis management plan, had no functioning risk management committee, and had a reputation as a fraternity of "meatheads." The Nationals were supported by fees collected by local chapters and derived at least 75% of their gross income from undergraduate dues and fees and were dependent on continued and increasing such dues and fees, which included fees from pledges.

¶ 30        As to the first factor, we find no support for a principal/agent relationship. Plaintiff's complaint did not allege facts that the Nationals authorized the NIU Chapter to act on their behalf or that the Nationals held out the NIU Chapter as their agent. See *Connick*, 174 Ill. 2d at 498-99 (a complaint relying on an agency relationship must contain allegations that the principal expressly or impliedly gave authority to the agent to act on the principal's behalf or that the principal held out the individual as his agent). As to the second factor, plaintiff's complaint alleged that the Nationals "controlled the activities and conduct" of their local chapters; could "assist local chapters in the conduct of rush or pledging activities or require alcohol or hazing education;" and had "the right and the power to expel, suspend or place restrictive remedial conditions on local chapters." However, the above allegations fall short of establishing "control." The Nationals have promulgated rules that the local chapters are to follow, yet the complaint does not allege that the Nationals dictate how the local chapters

implement these rules. The complaint did not allege that the Nationals had any control over which pledging events chapters actually held or that the Nationals could control how chapters planned or carried out the events. It only alleged that the Nationals "encouraged" pledging events "similar" to "Mom and Dad's Night." Also, the Nationals' power to expel or discipline local chapters or members was remedial only. The power to take remedial action "after the fact" does not amount to the right to direct or control a local chapter or member's actions. As to the third factor, the NIU Chapter's hazing conduct fell outside the scope of any alleged agency relationship. The NIU Chapter could plan and hold pledging events, but it was against the Nationals' rules to include hazing within those pledging events. Pledging and hazing are not synonymous. We find the allegations in plaintiff's complaint insufficient to allege an agency relationship and, accordingly, insufficient to hold the Nationals vicariously liable for the conduct of the NIU Chapter and its members.

¶ 31    Regarding plaintiff's direct theory of liability, plaintiff's complaint alleged that the Nationals owed a duty to David to "prevent the foreseeable consequences of required excessive consumption of alcohol during [an] initiation ritual." The complaint further alleged that the Nationals permitted dangerous pledge events to occur, failed to warn local chapters about the dangers and risks of "required alcohol related pledge events," failed to adopt policies for the local chapters to follow to prevent dangerous pledge events, failed to take reasonable steps to insure its local chapters followed the Nationals' policies regarding pledge events, failed to take reasonable steps to learn whether its local chapters were following the Nationals' policies, failed to ban pledging events outright at all of its local chapters when they knew pledge events were likely to result in bodily harm and death to pledges, failed to insure that the NIU Chapter had a continuing risk education policy and functioning risk awareness committee although they knew through their chapter consultant's reports that it had not had a program or committee for at least three years before David's death, and were otherwise careless and negligent.

¶ 32    Here, plaintiff seeks to hold the Nationals directly liable, through their acts or omissions, for the criminal conduct of the NIU Chapter, its members, and the nonmember sorority women. Essentially, what plaintiff's complaint alleges is that the Nationals should have taken certain affirmative action to protect the pledges from hazing and to control the criminal conduct of those who participated in the hazing.

¶ 33    In Illinois, an affirmative duty to aid or protect another against an unreasonable risk of physical harm or to control the conduct of another arises only within the context of a legally recognized "special relationship." *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 24; *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 234 (2000); see also Restatement (Second) of Torts §§ 314, 314A, 315 (1965). We have recognized the following four relationships that give rise to an affirmative duty to aid or protect another against an unreasonable risk of physical harm: common carrier and passenger, innkeeper and guest, custodian and ward, and possessor of land who holds it open to the public and member of the public who enters in response to the possessor's invitation. *Simpkins*, 2012 IL 110662, ¶ 20. We have also recognized a duty to a third party to control the individual who is the source of the harm when a defendant has a special relationship with that person, such as a parent-child relationship and a master-servant or employer-employee relationship. *Id*. Absent a special relationship, there can be no affirmative duty imposed on one for the benefit of another to warn or protect against the criminal conduct of a third party. *Iseberg v. Gross*, 227 Ill. 2d 78, 101

(2007); *Hills*, 195 Ill. 2d at 228 (one has no affirmative duty to control the conduct of another to prevent a criminal attack on a third party in the absence of a special relationship).

¶ 34     The appellate court found that the Nationals did not owe a duty to the pledges of the local chapters because imposing such a duty would present an "unrealistic burden." 2016 IL App (1st) 150128, ¶ 47. The court did not consider, and the parties did not raise, the "no-affirmative-duty" rule and the special relationship doctrine. Similarly here, the parties' contentions on appeal omit mention of the rule and doctrine and instead argue the issue of duty pursuant to the traditional four duty factors.

¶ 35     Nevertheless, since plaintiff's complaint alleges direct liability on behalf of the Nationals for the criminal conduct of the NIU Chapter, its members, and the nonmember sorority women, we must first consider whether a legally recognized special relationship exists between the parties. If no special relationship exists that would impose an affirmative duty upon the Nationals to protect the pledges or to control the conduct of those who hazed the pledges, then the Nationals owe no affirmative duty to the pledges. Since Illinois is a fact-pleading jurisdiction, plaintiff's complaint must allege facts, not mere conclusions, that establish a viable cause of action. *Iseberg*, 227 Ill. 2d at 86. When we read the allegations in plaintiff's complaint, we find that they do not plead specific facts that would come within any of the above legally recognized special relationships. The complaint does not sufficiently plead any of the special relationships of common carrier and passenger, innkeeper and guest, custodian and ward, or possessor of land and public invitee, nor does it adequately plead a parent-child relationship or master-servant or employer-employee relationship. Accordingly, absent a special relationship, there can be no affirmative duty imposed on the Nationals for the benefit of the pledges.

¶ 36     Our finding is consistent with this court's precedent. For example, in *Hills*, the plaintiff was coaching a Little League baseball team when he was attacked by the manager and assistant coaches for the opposing team. The plaintiff filed suit against his attackers, as well as the opposing team's sponsor and the host of the baseball tournament. We determined that the sponsor of the opposing team had no affirmative duty to control the attackers and the host had no affirmative duty to protect the plaintiff from the attackers because no special relationship existed between the parties. *Hills*, 195 Ill. 2d at 242, 252.

¶ 37     In *Iseberg*, the plaintiff was shot and paralyzed by a former business investor who suffered financial losses. The plaintiff filed suit against the investor, as well as other business partners for failing to warn him that the investor had made threats against the plaintiff's life. We ultimately found that there was no special relationship between the business partners and the plaintiff and therefore no affirmative duty to warn or protect. *Iseberg*, 227 Ill. 2d at 101. Of particular relevance, here, is what we said in response to one of the plaintiff's arguments. The plaintiff had also advanced an argument that in situations where "some type of relationship" exists between the parties, whether an affirmative duty may be imposed should be decided based upon consideration of the four traditional duty factors. *Id.* at 89. We took the opportunity to reiterate this court's long history of adherence to the no-affirmative-duty rule and the special relationship doctrine before rejecting the plaintiff's argument and reaffirming that the rule and doctrine "stand as the law of this state." *Id.* at 101.

¶ 38     Additionally, our appellate court has rejected attempts to hold universities liable for harm perpetrated by one student upon another in the absence of a special relationship. See *Rabel v.*

*Illinois Wesleyan University*, 161 Ill. App. 3d 348, 361-63 (1987) (university neither had a duty to protect student, who was injured as a result of a fraternity prank, in its capacity as landlord, nor had it voluntarily assumed or placed itself in a custodial relationship with its students); *Leonardi v. Bradley University*, 253 Ill. App. 3d 685, 690-91 (1993) (university had no duty to protect student from sexual assault that occurred at a fraternity house since the student did not qualify as a business invitee of the university).

¶ 39    Regarding cases that specifically address a national fraternity's liability, we note *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840 (Ky. 2005). In *Carneyhan*, the Supreme Court of Kentucky explained that the "key" to imposing a duty based on a special relationship is that the defendant's relationship with either the tortfeasor or the plaintiff "places the defendant in the best position to protect against the risk of harm." *Id.* at 850. It further explained that the defendant's ability to control the person who caused the harm "must be real and not fictional and, if exercised, would meaningfully reduce the risk of the harm that actually occurred." *Id.* at 851. In declining to hold the national fraternity liable for the actions of the local chapter in serving the underage plaintiff alcohol, which resulted in the plaintiff's death when she crashed her automobile into a utility pole, the court relied on the national organizations' inability to affirmatively monitor their local chapters. *Id.* at 854. The court reasoned that national organizations do not have sufficient resources to monitor the activities of their local chapters contemporaneously with each chapter's events and can only discipline a chapter "after the fact." (Internal quotation marks omitted.) *Id.*; see also *Shaheen v. Yonts*, 394 Fed. App'x 224, 229-30 (6th Cir. 2010) (national fraternity not liable for fraternity member who drove away from local fraternity house party while intoxicated and struck and killed pedestrian); *Garofalo v. Lambda Chi Alpha Fraternity*, 616 N.W.2d 647, 654 (Iowa 2000) (national fraternity had no duty to protect pledge from his excessive drinking that occurred after a big brother/little brother ceremony since the national fraternity neither furnished the alcohol nor forced him to consume any alcohol); *Walker v. Phi Beta Sigma Fraternity*, 96-2345, pp. 8-9 (La. App. 1 Cir. 12/29/97); 706 So. 2d 525, 529-30 (national fraternity had no duty to prevent local chapter's hazing of pledge by physical abuse since the national fraternity was unable to control the day-to-day actions of the local chapter, which was located several states away from the national fraternity); *Millard v. Osborne*, 611 A.2d 715, 719-20 (Pa. Super. Ct. 1992) (national fraternity had no duty to control the actions of its local chapter's members, who furnished alcohol at the fraternity house to a student who was killed shortly thereafter in a motorcycle accident).

¶ 40    We also acknowledge, however, that some courts have held that a national fraternity may be liable for the actions of its local chapters. See *Grenier v. Commissioner of Transportation*, 51 A.3d 367, 389 (Conn. 2012) (the extent of the national fraternity's control over its local chapter's actions raised a question of material fact sufficient to preclude summary judgment); *Brown v. Delta Tau Delta*, 2015 ME 75, ¶ 10, 118 A.3d 789, 792 (national fraternity owed a duty based on a theory of premises liability to student who was sexually assaulted during fraternity party); *Morrison v. Kappa Alpha Psi Fraternity*, 31,805, p. 16 (La. App. 2 Cir. 5/7/99); 738 So. 2d 1105, 1118-19 (national fraternity was liable to a pledge for the actions of its local chapter because it had voluntarily assumed a duty to prevent hazing but had acted negligently in performing its duty).

¶ 41    Notwithstanding the varied nuances of other jurisdictions' determinations of a national fraternity's liability for the actions of a local chapter, Illinois jurisprudence regarding an

affirmative duty is clear. We find no basis to impose an affirmative duty upon the Nationals absent a special relationship. Moreover, in *Iseberg*, we stated that this court has never recognized an affirmative duty to protect or control based upon consideration of the traditional four duty factors in the absence of a special relationship. *Iseberg*, 227 Ill. 2d at 98.

¶ 42    Since we conclude that the Nationals did not owe a duty to the pledges, plaintiff cannot establish a claim for negligence against them. See *Bell v. Hutsell*, 2011 IL 110724, ¶ 11 (unless a duty is owed, there can be no recovery in tort for negligence). We affirm the appellate court's dismissal of counts I and II of the complaint.

¶ 43                    Counts III Through VIII—The NIU Chapter, Its Officers
                          and Pledge Board Members, and Active Members

¶ 44    We next turn to counts III through VIII of plaintiff's complaint, which name the NIU Chapter, its officers and pledge board members, and its active members. Counts III and IV are directed at the NIU Chapter and its officers and pledge board members (collectively officers) in their official capacities. Counts V and VI are directed at the officers individually. Counts VII and VIII are directed at the active members.[4] Defendants contend that they did not owe a duty to the pledges, including David, either directly or based on a theory of voluntary undertaking.

¶ 45    Plaintiff alleged in counts III and IV of his complaint that the NIU Chapter and officers required pledges, including David, to participate in the "Mom and Dad's Night" pledge event as a condition of membership in the NIU Chapter and further required the consumption of excessive and dangerous amounts of alcohol in violation of the hazing statute. The counts also alleged that the officers failed to call 911 or seek medical attention for David, dissuaded others from obtaining medical attention for him, and instead placed him on a bed in a room where he would not be observed by others. Further, it was alleged that the officers failed to implement a continuing risk education program, failed to create a continuing risk education committee, and were otherwise careless and negligent.

¶ 46    To determine whether the NIU Chapter and officers owed a duty to the pledges, we look to the reasonable foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant. In deciding reasonable foreseeability, an injury is not reasonably foreseeable where it results from "freakish, bizarre, or fantastic circumstances." *Doe-3*, 2012 IL 112479 ¶ 31. Regarding the first two factors, we cannot say that, as a matter of law, an injury resulting from hazing is freakish, bizarre, or occurs under fantastic circumstances. The existence of hazing statutes across the country, including the Nationals' written policy against hazing as well as Illinois's hazing statute, indicates that injury due to hazing is reasonably foreseeable. We also find that injuries resulting from hazing events, especially those involving the consumption of large amounts of alcohol, are likely to occur. When pledges are required to consume large quantities of alcohol in short periods of time, their risk of injury is great—not only physical

---

[4]The named officers are Alexander M. Jandick, James P. Harvey, Omar Salameh, Patrick Merrill, Stephen A. Libert, John Hutchinson, and Daniel Biagini. The named active members are Michael J. Phillip Jr., Thomas F. Costello, David R. Sailer, Alexander D. Renn, Michael A. Marroquin, Estafan A. Diaz, Hazel A. Vergaralope, Michael D. Pfest, Andres Jimenez Jr., Isiah Lott, Andrew W. Bouleanu, Nicholas A. Sutor, Nelson A. Irizarry, John Wallace, Daniel S. Post, Nsenzi K. Salasini, Russell P. Coyner, Gregory Petryka, Kevin Rosetti, and Thomas Bralis.

injury due to their inebriated condition but injury or death resulting from alcohol poisoning. Regarding the last two factors, we find that the magnitude of the burden of guarding against injury is small and the consequences of placing that burden on the NIU Chapter and officers are reasonable. To require the NIU Chapter and officers to guard against hazing injuries is infinitesimal. Hazing is not only against the law in Illinois, it is against the university's rules as well as the Pi Kappa Alpha fraternity's rules. There can be no real burden to require the NIU Chapter and officers to comply with the law and the university's and fraternity's rules. And it seems quite reasonable to place that burden on the very people who are in charge of planning and carrying out the pledge event. We find that the NIU Chapter and the officers owed a duty to the pledges, including David, and plaintiff has sufficiently alleged a claim for negligence against them. Since we conclude that a duty exists, we need not determine whether a duty arose based on the theory of voluntary undertaking. We affirm the appellate court's reversal of the dismissal of counts III and IV.

¶ 47    Plaintiff alleged in counts V and VI of his complaint that the officers individually "knowingly and willingly approved, organized, planned, promoted, required and participated" in the "Mom and Dad's Night" pledge event where pledges would be required to consume dangerous and excessive amounts of alcohol "to a point of insensate intoxication" as a condition to membership in the NIU Chapter. The counts also alleged that the officers designated certain rooms and areas in the fraternity house in which to place pledges, including David, who became dangerously intoxicated and unconscious, failed to seek necessary medical attention for the pledges, and were otherwise careless and negligent.

¶ 48    When we consider the four duty factors, we again find that the first two factors weigh in favor of a duty because a hazing injury is reasonably foreseeable and is likely to occur. Similarly, we find that the magnitude of the burden of guarding against injury is small and the consequences of placing that burden on the officers are reasonable. As stated above, requiring the officers to comply with the law and the university's and fraternity's rules against hazing is an infinitesimal burden. Placing that burden on the officers who are alleged to have planned, promoted, and participated in the hazing event is reasonable. We find that the officers individually owed a duty to the pledges, including David, and plaintiff has sufficiently alleged a claim for negligence against them. Again, since we conclude that a duty exists, we need not determine whether a duty arose based on the theory of voluntary undertaking. We affirm the appellate court's reversal of the dismissal of counts V and VI.

¶ 49    Plaintiff alleged in counts VII and VIII of his complaint that the active members "knowingly and willingly agreed" to participate in the "Mom and Dad's Night" pledge event that required pledges to consume dangerous and potentially fatal amounts of alcohol as a condition of being accepted for membership in the NIU Chapter. The complaint further alleged that the members failed to seek medical attention for David after he became dangerously intoxicated and unconscious, placed him in a room where he would not be seen by others, and were otherwise careless and negligent.

¶ 50    Considering the duty factors, as stated above, the first two factors weigh in favor of a duty because a hazing injury is reasonably foreseeable and is likely to occur. Also, as stated above, the magnitude of the burden of guarding against injury is small, and the consequences of placing that burden on the members are reasonable. Placing the burden on those members who are alleged to have knowingly and willingly agreed to participate in the hazing event is

reasonable. We find that the members owed a duty to the pledges, including David, and plaintiff has sufficiently alleged a claim for negligence against them. Since a duty exists, we need not consider whether a duty arose based on voluntary undertaking. We affirm the appellate court's reversal of the dismissal of counts VII and VIII.

¶ 51                    Counts IX and X—The Nonmember Sorority Women

¶ 52    Plaintiff alleged in counts IX and X of his complaint that the nonmember sorority women participated in the "Mom and Dad's Night" hazing event by filling the pledges' cups with vodka, asking the pledges questions, directing the pledges to drink vodka based on the pledges' answers, calling the pledges derogatory names, and decorating "vomit buckets" for the pledges.[5] The complaint further alleged that the nonmember women "encouraged" and "required" the pledges, including David, to consume dangerous amounts of alcohol in violation of the hazing statute, gave David excessive and dangerous amounts of alcohol after he had become obviously and dangerously intoxicated, failed to seek medical attention for David, and were otherwise careless and negligent.

¶ 53    The nonmember women argue they owe no duty to the pledges because the hazing statute cannot apply to nonmembers of the organization into which admission is sought since nonmembers cannot "require" prospective members to perform any act. Further, they adopt the Nationals' arguments that they do not owe the pledges a duty because they have no control over the NIU Chapter's activities.

¶ 54    As we have already determined above, a hazing injury is reasonably foreseeable and is likely to occur. We also find that the magnitude of the burden of guarding against the injury is minor for the aforementioned reasons. Yet whether the consequences of placing this burden on nonmembers are reasonable is a much thornier determination. On the one hand, the nonmember women were not alleged to have had any part in planning the event, and they could not vote as to which pledges would be admitted into the NIU Chapter. Yet they willingly agreed to participate in the hazing event and actively did so by filling the pledges' cups with vodka, asking the pledges questions, directing the pledges to drink, calling the pledges derogatory names, and decorating "vomit buckets." We see little difference between the nonmember women's participation in the hazing event and the members' participation. As we noted in our analysis regarding the members, it seems quite reasonable to impose a duty on those individuals who actively participated in the hazing event. The appellate court found that the nonmember women did not have a duty because they could not have "required" David to drink as provided in the hazing statute. However, the hazing statute does not include language limiting its application to members of the organization in which a person is seeking to join. The statute provides that "[a] person commits hazing when he or she knowingly requires the performance of any act *** for the purpose of induction *** into any group." 720 ILCS 5/12C-50 (West 2012). Here, the message conveyed to the pledges, whether by the members or the nonmember women, was the same: Drink the vodka to become a member of the fraternity.

_____

[5]The named nonmember sorority women are Alyssa Allegretti, Jessica Anders, Kelly Burback, Christina Carrisa, Raquel Chavez, Lindsey Frank, Danielle Glennon, Kristina Kunz, Janet Luna, Nichole Minnick, Courtney Odenthal, Logan Redfield, Katherine Reporto, Tiffany Scheinfurth, Adrianna Sotelo, Prudence Willret, Karissa Azarela, Megan Ledone, Nicole Manfredini, Jillian Merril, and Monica Skowron.

- 15 -

The purpose of the hazing statute is to prevent hazing. We refuse to read into it such a loophole that would absolve a nonmember's participation when the statute has no such limiting language. The women were more than mere guests encouraging the pledges to drink. They were an integral part of the event and, for purposes of that event, occupied a similar position of influence over the pledges as the members did. Further, we believe that public policy dictates imposing a duty. Hazing is illegal, and those individuals who choose to participate in such acts should bear the consequences of their actions. Under the circumstances alleged here, we find that the nonmember women owed a duty to the pledges, including David, and plaintiff has sufficiently alleged a claim for negligence against them. We reverse the appellate court's dismissal of counts IX and X.

¶ 55                                    CONCLUSION

¶ 56    In summary, the complaint is dismissed as to the Pi Kappa Alpha national organizations. The complaint may proceed against the NIU Chapter, its officers and members, and the nonmember sorority women.

¶ 57    Accordingly, we affirm the appellate court's dismissal of counts I and II of the complaint. We affirm the appellate court's reversal of the dismissal of counts III through VIII of the complaint. We reverse the appellate court's dismissal of counts IX and X of the complaint. We remand the cause to the circuit court for further proceedings consistent with this opinion.

¶ 58    Appellate court judgment affirmed in part and reversed in part.

¶ 59    Circuit court judgment affirmed in part and reversed in part.

¶ 60    Cause remanded.

¶ 61    CHIEF JUSTICE KARMEIER, concurring in part and dissenting in part:

¶ 62    Like Justice Theis, I join the majority's opinion, except as to counts I and II of the plaintiff's fifth amended complaint. I agree with Justice Theis that those counts should not have been dismissed. Reversal of the dismissal of those counts is mandated by our decision in *Simpkins*, 2012 IL 110662, and the four traditional duty factors. However, unlike Justice Theis, I would refrain from addressing the special relationship doctrine. Therefore, I do not join the views expressed under the headings "1. Special Relationships Between Defendants and Tortfeasors" and "2. Special Relationships Between Defendants and Plaintiffs" of her partial concurrence and partial dissent. See *infra* ¶¶ 79-100.

¶ 63    JUSTICE THEIS, concurring in part and dissenting in part:

¶ 64    I join the majority's opinion, except as to counts I and II of the plaintiff's fifth amended complaint. In my view, the plaintiff has sufficiently alleged a negligence claim against the national organizations, Pi Kappa Alpha Corporation and Pi Kappa Alpha International Fraternity.

¶ 65    This case comes before us on appeal from the trial court's decision to grant the national organizations' motion to dismiss the plaintiff's complaint under section 2-615 of the Code of Civil Procedure. 735 ILCS 5/2-615 (West 2014). Our review of such a decision is *de novo*. *Better Government Ass'n v. Illinois High School Ass'n*, 2017 IL 121124, ¶ 57. We must

determine whether the allegations of the plaintiff's complaint and any reasonable inferences that arise from those allegations, when viewed in the light most favorable to the plaintiff, are sufficient to state a claim. *Kanerva v. Weems*, 2014 IL 115811, ¶ 33. We must accept as true all well-pleaded facts, and we can affirm a section 2-615 dismissal only if it is clearly apparent that no set of facts entitles the plaintiff to recover. *Cowper v. Nyberg*, 2015 IL 117811, ¶ 12.

¶ 66    The majority begins its analysis of the plaintiff's complaint by addressing the two counts directed at the national organizations. According to the majority, the plaintiff contends that the national organizations are vicariously liable for the negligence of Northern Illinois University's Pi Kappa Alpha chapter (NIU Chapter) and its members and that the national organizations are also directly liable for their own negligence. As the majority notes, both counts are substantively identical.  Count I is brought under the Wrongful Death Act (740 ILCS 180/1 *et seq.* (West 2016)), and count II is brought under the Survival Act (755 ILCS 5/27-6 (West 2016)). Neither count contains allegations of an agency relationship that would support a vicarious liability claim. Despite the plaintiff's argument to the contrary, he did not offer sufficient facts to show that members of the NIU Chapter were agents of the national organizations. The plaintiff maintained only that the organizations "conducted their business of organizing, promoting[,] and recruiting membership in Pi Kappa Alpha fraternities and organization through, among others, [the NIU Chapter]." That statement is simply not enough to survive a motion to dismiss.

¶ 67    As the plaintiff reminds us, however, he faced a serious obstacle before the trial court. The plaintiff conducted some initial discovery to learn the identities of the NIU Chapter members and the nonmember women who were involved in the events leading to David's death, adding those individuals as defendants. Further discovery was halted when the trial court granted the individual defendants' motion to stay discovery due to the pending criminal cases against them and the accompanying fifth amendment concerns. The plaintiff later filed a motion for leave to take discovery, stating that the criminal cases were nearing dispositions, which would remove any such concerns. At a hearing on August 20, 2014, the trial judge stated that she wanted "to get a good handle on what's going on in DeKalb after the criminal proceedings" before ruling on the plaintiff's motion. On October 16, 2014, the trial court denied the plaintiff's motion without comment about those proceedings. On December 11, 2014, the trial court dismissed the plaintiff's complaint with prejudice, foreclosing any further fact development. Now that the criminal charges against the individual defendants have been resolved, this court should vacate the trial court's order dismissing the plaintiff's complaint with prejudice and lift the trial court's bar on discovery. The national organizations acknowledge in their brief that active members of the NIU Chapter "were arguably 'employed' to secure new members for the ongoing stability of the national Fraternity." Allowing the plaintiff to depose the NIU Chapter members may provide details about their interactions with the national organizations that could establish an agency relationship and, therefore, vicarious liability.[6] See *Kenner v. Kappa*

---

[6]Some courts have taken that route in determining that national organizations may be liable for the conduct of local chapters and their members. See *Ballou v. Sigma Nu General Fraternity*, 352 S.E.2d 488, 496 (S.C. Ct. App. 1986) (holding that a national organization "was bound by the acts of its local chapter *** since they were performed within the apparent scope of its authority"); *Marshall v. University of Delaware*, 1986 WL 11566, *7 (Del. Super. Ct. Oct. 8, 1986) (holding that "one might reasonably conclude" a local chapter's "alleged failure to control its members was within the scope of

*Alpha Psi Fraternity, Inc.*, 2002 PA Super 269, ¶ 15 (stating that the trial court erred in failing to "consider the full scope of the relationship as established by the parties' deposition testimony").

¶ 68    The plaintiff's chief allegations concern the direct liability of the national organizations. To state a claim for negligence, a plaintiff must allege facts that show the defendant owed a duty of reasonable care to the plaintiff, the defendant breached that duty, and that breach was the proximate cause of the plaintiff's damages. See *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 14. The crux of this case is the duty element.[7] The plaintiff must convince us that the national organizations owed David a duty because "[u]nless a duty is owed, there is no negligence." *American National Bank & Trust Co. v. National Advertising Co.*, 149 Ill. 2d 14, 26 (1992). The existence of a duty is a matter of law. *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22.

¶ 69    The threshold inquiry in this case is whether the national organizations, by their own acts or omissions, contributed to a risk of harm to David. See *Simpkins*, 2012 IL 110662, ¶ 21; see generally Restatement (Second) of Torts § 302B (1965) ("An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."); Restatement (Third) of Torts, Liability for Physical and Emotional Harm § 37, cmt. d (2012) ("The Restatement Second of Torts § 302B, Comment *e*, provides for a duty of care when 'the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such [third-party] misconduct.' "). If the answer to that question is yes, the analysis is familiar. The court must weigh public policy considerations to determine whether the national organizations owed David a duty of reasonable care. *Simpkins*, 2012 IL 110662, ¶ 21. Traditionally, we have reduced those considerations to four factors: (1) the foreseeability of the plaintiff's injury, (2) the likelihood of that injury, (3) the magnitude of the burden to guard against that injury, and (4) the consequences of placing that burden on the defendant. *Id.* ¶ 18. Generally, we balance the foreseeability and likelihood of harm against the burdens and consequences of imposing a duty on the defendant for the benefit of the plaintiff (*Hutchings v. Bauer*, 149 Ill. 2d 568, 571 (1992)), and the weight accorded to those factors depends upon the details of the case

its alleged agency" with the national organization); *Edwards v. Kappa Alpha Psi Fraternity, Inc.*, No. 98 C 1755, 1999 WL 1069100, *6 (N.D. Ill. Nov. 18, 1999) (denying a national organization's summary judgment motion on a plaintiff's vicarious liability claim because the organization "may have possessed some control over its local members and their houses"); see also *Butler v. Gamma Nu Chapter of Sigma Chi*, 445 S.E.2d 468, 482 (S.C. Ct. App. 1994); *Supreme Lodge of World, Loyal Order of Moose v. Kenny*, 73 So. 519 (Ala. 1916); *Thompson v. Supreme Tent of Knights of Maccabees of the World*, 82 N.E. 141 (N.Y. 1907); *Mitchell v. Leech*, 48 S.E. 290 (S.C. 1904).

Notably, the same attorney represented both the national organizations and the NIU Chapter before the trial court, and new attorneys represent both the national organizations and the NIU Chapter before this court. The relationship between those defendants may be closer than the national organizations are willing to admit. See generally Cassandra Coolidge, *Fraternizing With Franchises: A Franchise Approach to Fraternities*, 66 Emory L.J. 917 (2017).

[7]Neither the national organizations nor the majority address or even dispute that the plaintiff's allegations of breach, causation, and damages are sufficient. I believe that they are, so I confine my discussion to the sufficiency of the plaintiff's allegations as they concern duty.

(*Bruns v. City of Centralia*, 2014 IL 116998, ¶ 14). However, if the answer to the threshold question is no, the analysis shifts. The court must look for a so-called "special relationship" that establishes a duty. *Simpkins*, 2012 IL 110662, ¶ 21.

¶ 70 The majority ignores the threshold question and rushes to the conclusion that the plaintiff seeks to hold the national organizations liable for "the criminal conduct of the NIU Chapter, its members, and the nonmember sorority women." *Supra* ¶ 32. The majority recharacterizes the plaintiff's allegations: "Essentially, what [the] plaintiff's complaint alleges is that the [national organizations] should have taken certain affirmative action to protect the pledges from hazing and to control the criminal conduct of those who participated in the hazing." *Supra* ¶ 32. The majority then states that an affirmative duty to aid or protect arises only when there is a special relationship between the defendant and the plaintiff or between the defendant and the third party who injured the plaintiff. *Supra* ¶ 33. The majority concludes that the national organizations did not owe a duty to David because this case does not involve such a relationship. *Supra* ¶ 35.

¶ 71 The majority's casual logic is troubling for two reasons. First, the majority abandons the principle of party presentation, and second, the majority compounds that error by oversimplifying the unbriefed issues that it chooses to address *sua sponte*.

¶ 72 Our precedent counsels adherence to the principle of judicial restraint. See *People v. White*, 2011 IL 109689, ¶ 153 ("courts of review *** are not free rangers riding about the legal landscape looking for law to make"). Undoubtedly, a reviewing court has the power to decide issues that the parties have not raised (see Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994)) but should refrain from doing so when it would transform the court from arbiter to advocate. As this court has stressed, we follow the principle of party presentation, relying on the parties to frame the issues for decision. *People v. Givens*, 237 Ill. 2d 311, 323 (2010). Our adversary system works best when the parties themselves advance their best arguments (*Greenlaw v. United States*, 554 U.S. 237, 244 (2008)) and we hear from both sides pursuant to our motto, *audi alteram partem*. When we address unbriefed issues, we are "forced to speculate as to the arguments that the parties might have presented had these issues been properly raised before this court. To engage in such speculation would only cause further injustice ***." *People v. Rodriguez*, 336 Ill. App. 3d 1, 14 (2002); see *People v. Boeckmann*, 238 Ill. 2d 1, 13 (2010) ("it is not appropriate to address the issue in this case where the parties have not raised or argued it"); accord *Roberts v. Northland Insurance Co.*, 185 Ill. 2d 262, 270 (1998).

¶ 73 As the majority recognizes, the parties here focused on only the four traditional duty factors and did not raise the so-called "no-affirmative-duty" rule and the special relationship doctrine in either the appellate court or this court. *Supra* ¶ 34. The majority acknowledges that shortcoming but proceeds with a "nevertheless" shrug to discuss those issues anyway (*supra* ¶ 35), ultimately holding in a case of first impression that national fraternal organizations have no special relationship either with their local chapters and members or with their pledges and, consequently, owe no duty to pledges who die during membership or initiation events purportedly encouraged and sanctioned by the organizations.

¶ 74                                    The Special Relationship Doctrine

¶ 75 The majority presents the relevant blackletter law superficially. This court has stated that a defendant has no affirmative duty to protect a plaintiff from a third-party tortfeasor, absent a

special relationship between either the defendant and the plaintiff or the defendant and the tortfeasor. See *Simpkins*, 2012 IL 110662, ¶ 20. That is a paraphrase of section 315 of the Second Restatement of Torts:

> "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> > (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> >
> > (b) a special relation exists between the actor and the other which gives to the other a right to protection." Restatement (Second) of Torts § 315 (1965).

Section 37 of the Third Restatement similarly provides, "An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless" one of the affirmative duties listed in sections 38 to 44 applies. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 (2012).

¶ 76    This court has recognized four special relationships between defendants and plaintiffs that may give rise to duties: common carrier/passenger, innkeeper/guest, possessor of land/invitee, and custodian/ward. See *Simpkins*, 2012 IL 110662, ¶ 20 (citing *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 438 (2006)); *Iseberg v. Gross*, 227 Ill. 2d 78, 88 (2007) ("The existence of one of these four 'special relationships' has typically been the basis for imposing an affirmative duty to act where one would not ordinarily exist."); see generally Restatement (Second) of Torts § 314A (1965); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 40(b) (2012). This court also has recognized several special relationships between defendants and tortfeasors—parent/child and master/servant or employer/ employee—that also may give rise to duties. *Simpkins*, 2012 IL 110662, ¶ 20; see *Norskog v. Pfiel*, 197 Ill. 2d 60, 84 (2001) (parent/child); *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 234 (2000) (master/servant); see generally Restatement (Second) of Torts §§ 316, 317 (1965); Restatement (Third) of Torts, Liability for Physical and Emotional Harm § 41 (2012).

¶ 77    The majority states that "this court has never recognized an affirmative duty to protect or control based upon consideration of the traditional four duty factors in the absence of a special relationship." *Supra* ¶ 41 (citing *Iseberg*, 227 Ill. 2d at 98). The majority forgets that special relationships between defendants and tortfeasors or between defendants and plaintiffs are not a closed set. Comment g to section 37 of the Third Restatement instructs, "The Sections recognizing certain relationships as imposing an affirmative duty are stated nonexclusively, leaving to the courts whether to recognize additional relationships as sufficient to impose an affirmative duty." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37, cmt. g (2012); see *Iseberg*, 227 Ill. 2d at 88 n.4 (noting that section 40 of the 2005 final draft of the Third Restatement added new special relationships); see generally Prosser and Keeton on the Law of Torts § 53, at 359 (W. Page Keeton *et al.* eds., 5th ed. 1984) ("Changing social conditions lead constantly to the recognition of new duties.").

¶ 78    The Restatement plainly establishes that what the majority terms the special relationship doctrine continues to evolve, as courts and commentators across the country grapple with its scope and its application in new contexts. The issues presented by the doctrine involve arguments over public policy, but the parties in this case have been robbed of an opportunity to make those arguments by the majority, which has abandoned our typical search for a careful and deliberate decision via the adversarial system for a simple, result-oriented answer by fiat.

Because the majority has chosen that ill-advised route, and offered a truncated special-relationship argument on behalf of the national organizations that they never imagined, I will offer some more comprehensive points that the plaintiff might have raised. I will address in turn both the defendant/tortfeasor and the defendant/plaintiff aspects of the special relationship doctrine.

¶ 79                              1. Special Relationships Between Defendants and Tortfeasors

¶ 80       Regarding a special relationship between a defendant and a tortfeasor that may give rise to a duty in favor of a plaintiff, the majority concludes that the plaintiff's complaint does not "adequately plead a parent-child relationship or master-servant or employer-employee relationship." *Supra* ¶ 35. That conclusion seems to be based upon *Simpkins*, where the court offered the aforementioned exceptions to the general rule of no affirmative duty. See *Simpkins*, 2012 IL 110662, ¶ 20 (citing Restatement (Second) of Torts §§ 316, 317 (1965)). Of course, there is no way that the plaintiff could plead that the national organizations and the NIU Chapter members stood in a parent-child or employer-employee relationship, so the majority's reference to those exceptions is specious. Further, as I have noted, the plaintiff has not sufficiently pleaded a master-servant relationship between the national organizations and the local members, though facts establishing such a relationship could become known through discovery.

¶ 81       The primary weakness of the majority's opinion is its incompleteness. The Second Restatement, cited so prominently in *Simpkins*, also contains section 319, which provides:

> "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) of Torts § 319 (1965).

Section 41 of the Third Restatement has replaced sections 316, 317, and 319 of the Second Restatement and states:

> "(a) An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of the relationship.
>
> (b) Special relationships giving rise to the duty provided in Subsection (a) include:
>
> (1) a parent with dependent children,
>
> (2) a custodian with those in its custody,
>
> (3) an employer with employees when the employment facilitates the employee's causing harm to third parties, and
>
> (4) a mental-health professional with patients." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 41 (2012).

Notably, comment i to that section instructs, "the list of special relationships *** is not exclusive," so "[c]ourts may decide that additional relationships justify exceptions to the no-duty rule." *Id.* § 41, cmt. i.

¶ 82       Both section 319 of the Second Restatement and section 41 of the Third Restatement intimate that when the relationship between the defendant and the tortfeasor involves a measure of control, a duty may exist for the benefit of a plaintiff. See *Marshall*, 1986 WL

11566, *4 ("By using the language 'take charge', the [Second] Restatement finds the duty to control the conduct of another primarily in the extent to which one has the power or ability to control another."); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 41, cmt. c ("the relationships identified in this Section are ones in which the actor has some degree of control over the other person"); Byron L. Leflore, Jr., *Alcohol and Hazing Risks in College Fraternities: Re-Evaluating Vicarious and Custodial Liability of National Fraternities*, 7 Rev. Litig. 191, 224 (1988) (counseling national organizations to "sever ties to whatever extent is necessary to counterbalance the implication of control").

¶ 83    The majority discusses a sole out-of-state case, *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840 (Ky. 2005), involving a national fraternal organization. In *Carneyhan*, the Kentucky Supreme Court held that a national organization owed no duty to a young woman who drank alcohol at a local chapter and later died when the automobile that she was driving collided with a traffic pole. The court stated that, in evaluating negligence claims involving "less well-settled special relationships," the key has been "an ability to control in a manner that would be meaningful in the prevention of the harm that actually occurred." *Id.* at 852. That is, " 'in order for a special relation to exist between the defendant and the third person, the defendant must have the ability to control the third person's conduct.' " *Id.* at 853 (quoting *Estates of Morgan v. Fairfield Family Counseling Center*, 673 N.E.2d 1311, 1322 (Ohio 1997)). The court clarified that "the ability of control is not the fictitious control which provides the basis for vicarious liability" but, rather, control "in a very real sense" that "includes some sort of leverage" that could prevent "the harm caused by the person under control." (Internal quotation marks omitted.) *Id.* The court determined that the national organization's sole means of control over the local chapter was the ability to revoke its charter and concluded that that *ex post facto* sanction was not actual control that would support imposition of a duty on the national organization. *Id.* at 853-54.

¶ 84    The result in *Carneyhan* is fact specific, but its holding that "less-settled" special relationships—*i.e.*, special relationships beyond those mentioned in the Restatements—may be established by showing that the defendant somehow exercised control over the tortfeasor is important. That point is echoed in the other cases cited by the majority. See *Garofalo v. Lambda Chi Alpha Fraternity*, 616 N.W.2d 647, 654 (Iowa 2000); *Walker v. Phi Beta Sigma Fraternity*, 96-2345, pp. 8-9 (La. App. 1 Cir. 12/29/97); 706 So. 2d 525, 529; *Shaheen v. Yonts*, 394 Fed. App'x 224 (6th Cir. 2010); *Millard v. Osborne*, 611 A.2d 715, 719 (Pa. Super. Ct. 1992). It is further echoed in cases that the majority fails to cite. See *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154, 163 (Ind. 2014); *Yost v. Wabash College*, 3 N.E.3d 509, 521 (Ind. 2014); *Foster v. Purdue University Chapter, The Beta Mu of Beta Theta Pi*, 567 N.E.2d 865, 872 (Ind. Ct. App. 1991); *Colangelo v. Tau Kappa Epsilon Fraternity*, 517 N.W.2d 289, 292 (Mich. Ct. App. 1994); *Alumni Ass'n v. Sullivan*, 572 A.2d 1209, 1213 (Pa. 1990). The courts in those cases all agree that national organizations lack control over local chapters and their members, but their reasoning is underdeveloped. Essentially, the courts mention distance and the logistical impediments that it poses to control.

¶ 85    Courts in several additional states have looked more closely at the relationship between national organizations and local chapters and found that national organizations may exercise some measure of control over local chapters and their members. See *Grenier v. Commissioner of Transportation*, 51 A.3d 367, 389 (Conn. 2012) ("plaintiff presented evidence sufficient to create a genuine issue of material fact that [the national organization] was sufficiently involved

- 22 -

with the activities of [the local chapter] to owe [the plaintiff's decedent] a duty of care"); *Marshall*, 1986 WL 11566, *8 (holding that the national organization "has a duty to take reasonable steps to control the conduct" of the local chapter and its members); *Brown*, 2015 ME 75, ¶ 23 ("In short, the national fraternity does more than simply suggest that its members conform to certain norms; it enforces its rules, regulations, and codes of conduct through constant monitoring, oversight, and intervention."); *Kenner*, 2002 PA Super 269, ¶ 15 ("The consequences of imposing this duty on [the fraternity] is minimal as it has taken steps to protect initiates by banning hazing and instituting new intake procedures."); *Mann v. Alpha Tau Omega Fraternity, Inc.*, No. W2012-00972-COA-R3-CV, 2013 WL 1188954, at *7 (Tenn. Ct. App. Mar. 22, 2013) ("that [the national organization] undisputedly *does not* supervise the day-to-day operations of its local chapters does not equate to a finding that it *could not* exercise such supervision if it desired to do so or that it *should not* exercise such supervision based upon public policy considerations" (emphases in original)); *Alexander v. Kappa Alpha Psi Fraternity, Inc.*, 464 F. Supp. 2d 751, 756 (M.D. Tenn. 2006) (denying the national organization's motion for summary judgment, stating "a reasonable jury could conclude that [the organization] was on notice that hazing may have been occurring at [the local chapter]," so the organization "had a duty to prevent hazing-related injuries from taking place there").

¶ 86    The reasoning in those cases is significantly more robust than the cases cited by the majority. Together, the latter set of cases stands for the proposition that control depends upon more than distance. Control depends upon facts, including the national organization's constitution and bylaws; the national organization's financial ties to local chapters; the national organization's rules and guidelines regarding risk and crisis management; the national organization's ability to dictate to local chapters specific procedures regarding recruitment and initiation; the national organization's ability to censure and punish local chapters and their members; the national organization's oversight via its own personnel to ensure compliance with fraternity and university policies, as well as local laws; and the national organization's knowledge that its policies are not being followed or that the local chapter is engaging in inappropriate behavior. Those facts have allowed those courts to establish that national organizations owe a duty of reasonable care.

¶ 87    Here, the national organizations discuss control in the context of the four traditional duty factors, but their arguments are relevant to whether there is a special relationship between the organizations and the NIU Chapter that could support a duty. The national organizations contend that they suffer from a "basic inability to reasonably control the day-to-day operations of hundreds of chapters across the country" and insist that they are "simply unable to prevent local members from hazing activities without the imposition of essentially impossible burdens." The national organizations, however, do not describe or quantify those burdens, other than to imagine daily telephone calls from their Memphis, Tennessee, headquarters to local chapters across the country for assurances that no alcohol consumption or hazing is taking place in each chapter house. The national organizations further posit "the need to station a monitor in each chapter house." According to the national organizations, both scenarios would be "astronomically expensive—and at a cost that could only be passed on to the members of the fraternity."

¶ 88    The plaintiff's complaint forcefully counters the national organizations' feeble insistence that they lacked control over the NIU Chapter. The plaintiff alleged that the pledge event at

which David died, a "Mom and Dad's Night" or "Greek Family Night," is "a common fraternity pledging activity practiced in the same or similar forms by chapters of *** Pi Kappa Alpha *** and other fraternities and sororities throughout the country."[8] The plaintiff then alleged that representatives of the national organizations told local chapter officers and members that such events were "good for pledge and member retention" and encouraged the officers and members to hold a "Greek Family Night" event as part of the NIU Chapter's pledging process. The officers and members supposedly took that coaxing to heart, feeling that a family night "would improve the fraternity's retention of pledges as active members, thereby benefitting the entire Pi Kappa Alpha organization through increased income from member dues."

¶ 89    The plaintiff's description of the national organizations' advice dovetailed into his description of their business. According to the plaintiff, the national organizations were "engaged in the business of organizing, promoting, and recruiting membership" in local chapters. The plaintiff alleged that the national organizations, "as further part of their business, supervised, advised[,] required[,] and controlled the activities and conduct" of local chapters and specifically the NIU Chapter. That control included "specifically binding, mandatory[,] and required adherence to the fraternity Constitution [and] Risk Assessment Manual[,] Chapter Codes[,] and its quarterly publication *The Shield and Diamond* and *The Garnet and Gold* pledge manual." The plaintiff claimed that collectively those items established an antihazing policy and "directed local chapters to employ certain recruiting techniques."

¶ 90    The plaintiff continued by alleging that the national organizations' documents and publications gave them powers over the local chapters and their members:

> "Through the fraternity Constitution, Chapter Codes, Risk Assessment Manual[,] and publications such *The Garnet and Gold* and *The Shield and Diamond*[,] [the national organizations] had the right and the power to expel, suspend[,] or place restrictive remedial conditions on continued operations of local chapters without notice or proof of a violation of any standard, law[,] or rule, and particularly reserved the right and power to assist local chapters in the conduct of rush or pledging activities or require alcohol or hazing education; and further, through the same sources, had the right and power to expel, suspend[,] or place individual members of local chapters on 'alumni status' without notice of proof of a violation of any standard, law[,] or rule; further [the national organizations] had the right[,] power[,] and authority to ban and prohibit pledging activities outright at local chapters, including [the NIU Chapter]."

¶ 91    Those allegations create an inference that some of the national organizations' publications and documents, particularly those related to risk assessment and management, provided rules for local chapters and their members to follow, violations of which could subject local chapters and their members to removal from the fraternity.[9]

---

[8]Indeed, a similar event—"Pledge Dad Night"—led to the plaintiff's injury in *Quinn v. Sigma Rho Chapter of Beta Theta Pi Fraternity*, 155 Ill. App. 3d 231, 233-34 (1987).

[9]That inference is more than borne out by the specifics of the national organizations' risk management manual, to which the plaintiff refers.

Pi Kappa Alpha is a member of the Fraternity Executives Association (FEA). See *Fraternity Members*, Fraternity Executives Ass'n, http://fea-inc.org/fraternity-members.html (last visited Jan. 16, 2018). The FEA created the Fraternal Information & Programming Group (FIPG), whose risk

¶ 92    The national organizations allegedly engaged in some level of supervision over the local chapters that gave them specific and alarming information about the NIU Chapter. The plaintiff asserted:

management manual labels it "[a] risk management association of men's and women's national and international fraternities and sororities." *FIPG Risk Management Manual*, FIPG, Inc. (Jan. 2013), http://0104.nccdn.net/1_5/161/330/2d3/FIPG_MANUAL.pdf. At the time of David's death in 2012, the 2007 version of the manual was in effect. That manual, in turn, contained an appendix with a crisis management plan. See Caitlyn Flanagan, *The Dark Power of Fraternities*, The Atlantic (Mar. 2014), https://www.theatlantic.com/magazine/archive/2014/03/the-dark-power-of-fraternities/357580/ ("[T]he Fraternal Information and Programming Group's chillingly comprehensive crisis-management plan was included in its [risk management] manual for many years. But in 2013, the plan suddenly disappeared from its pages."). Both documents are widely available online through college and university websites, as well as fraternity and sorority websites. See, *e.g.*, *FIPG Training and Resource Manual* (Sara Hillis ed., Spring 2009), https:// www.lycoming.edu/StudentPrograms/ pdfs/FIPGManual.pdf; see also *FIPG Risk Management Manual*, FIPG, Inc. (Dec. 2003), http://deanofstudents.utexas.edu/sfl/downloads/fipg.pdf (2003 version of the FIPG Risk Management Manual).

The 2007 crisis management plan offered step-by-step "procedures to be followed" by chapter presidents in the event of "a situation, emergency or tragedy." Those procedures are very specific. Chapter presidents were given a script entitled "Ask these questions" for an "emergency planning session" with other officers and at least one alumnus. Those questions involved developing a list of seven worst-case scenarios because "[n]o one enjoys discussing a tragic fire or the death of a member, but those occur." Chapter presidents were instructed to inquire of their colleagues how to prepare for each listed situation and to make a "Who to call" list of police and fire departments, regional and local fraternity volunteers, and even college or university administrators. The plan cautioned, however, "Be certain to check with your Headquarters staff as to contacting administrators—in some cases, someone from the national organization may wish to make that call." In bold letters, the plan reiterated:

"Regardless of the situation, circumstances or day or time….it is always better to call your national headquarters or a volunteer. Let them 'make the call' as to whether a situation is an emergency or less significant. Someone will be available. They would much rather hear about a situation from you at 3:27 a.m. than receive an 8:01 a.m. telephone call from a reporter asking for a comment about, 'The situation involving *your* chapter at ___."

The plan then provided more directions for chapter presidents once a situation has occurred. Chapter presidents were told to "[o]btain the *facts*" (emphasis in original) and relay them to persons on the call list, then call a meeting of local chapter members and pledges at which the president exhibits control over the situation. Chapter presidents should inform the members and pledges about what occurred and about the need for confidentiality. Chapter presidents are "the primary or key contact person" and will represent the chapter at any meetings or hearings. Chapter presidents, however, may defer any spokesperson duties to the national headquarters staff. The plan, again in bold letters, emphasizes the role of the national organizations: "Your national organization may have a different procedure to follow and that will be your guide."

The penultimate item in the plan concerned a special situation: "IF A MEMBER IS INJURED, BECOMES SERIOUSLY ILL, OR DIES." On that topic, the plan directed:

"Do not notify parents or other family members. Leave notification of the parents to the professionals—law enforcement, medical staff, university administrators.

These situations do require immediate notification of the appropriate national headquarters staff member and/or volunteers. They can advise you as to the appropriate response to a situation."

"Through annual Chapter Consultant on site week long assessments of each local operations sought and obtained detailed, granular knowledge about the conduct and operations of local chapters, preparing detailed Chapter Consultant Reports analyzing each chapters' recruitment performance, continuing risk awareness education, alumni relations, finances, housing, management, athletics, scholarship, campus involvement, community service, [and] public relations; in particular, [the national organizations] knew through its Chapter Consultant's reports that [the NIU Chapter] for at least three years before and on November 1, 2012[,] that [the NIU Chapter] did not provide continuing risk education to members, did not have a risk awareness program, had no written crisis management plan and, upon information and belief, had no functioning risk management committee; and further [the national organizations] knew, through their Consultant Reports that [the NIU Chapter] had a reputation, stigma[,] and image on the Northern Illinois University campus as a fraternity of 'meatheads' and recommended diversifying their activities on campus to develop a more positive image."

¶ 93　　Then the plaintiff continued by addressing why the national organizations were "present in and engaged in" recruitment of new members. According to the plaintiff, the national organizations are "supported by fees collected by local fraternity chapters, including [the NIU Chapter], from fraternity members and prospective members or pledges." The plaintiff further stated that the national organizations "derived at least 75% of [their] gross income from undergraduate dues and fees and were therefore acutely dependent on continued and increasing such dues and fees." Thus, the officers and members of the NIU Chapter knew that staying in the good graces of the national organizations required a steady cash flow from such dues and fees. The national organizations "specifically authorized, directed, required[,] and empowered [their] local fraternity chapters, including [the NIU Chapter,] to collect initiation and other fees from fraternity pledges and to initiate pledges" into the fraternity.

¶ 94　　Reading the complaint in the light most favorable to the plaintiff, the national organizations exercised "some degree of control" over the NIU Chapter and its members. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 41, cmt. c (2012). The national organizations' documents and publications, including their risk assessment manual, established rules to govern the conduct of local chapters and their members; violations of those rules, even without notice of proof, could subject chapters and members to expulsion or suspension. The national organizations were concerned with member recruitment and retention, and they maintained the power to assist rush or pledging activities at local chapters or to ban such activities altogether. Additionally, there were financial ties between the national organizations and local chapters. Not only do the national organizations rely heavily upon dues and fees generated and collected by local chapters, they also review the finances of local chapters on an annual basis.[10] Finally, the national organizations, through their chapter consultants, exercised oversight of local chapters. And the chapter consultant responsible for the NIU Chapter had specific knowledge that that chapter had had no risk management program or crisis management plan for three years before David died.

_____

[10]The national organizations concede many of those points in their brief, where they state that "a national fraternity has the right to suspend or revoke a chapter's charter after a violation occurs; provide advice; issue rules and standards; and receive dues from the chapter."

¶ 95 If the plaintiff had made this argument, I may well have concluded that the national organizations exercised sufficient control over the NIU Chapter and its members to find a special relationship that justifies imposing a duty on the national organizations. That conclusion remains conditional because I do not know how the national organizations would have responded.

¶ 96                     2. Special Relationships Between Defendants and Plaintiffs

¶ 97 Regarding a special relationship between a defendant and a plaintiff that may give rise to a duty, the majority concludes that the plaintiff's complaint does not "plead specific facts that would come within any of the [four] legally recognized special relationships"—common carrier/passenger, innkeeper/guest, possessor of land/invitee, and custodian/ward. *Supra* ¶ 35. That conclusion is correct but deficient.

¶ 98 Section 314A of the Second Restatement catalogs those four special relationships (Restatement (Second) of Torts § 314A (1965)), and section 40(b) of the Third Restatement adds three more—employer/employee, school/student, and landlord/tenant (Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 40(b) (2012)). Comment o to section 40 of the Third Restatement reiterates that that list of relationships is not exclusive (*id.* § 40, cmt. o), and comment h offers a rationale for this branch of the special relationship doctrine and explains when it may be appropriate to expand it:

> "The term 'special relationship' has no independent significance. It merely signifies that courts recognize an affirmative duty arising out of the relationship where no duty would exist pursuant to § 37. Whether a relationship is deemed special is a conclusion based on reasons of principle or policy.
>
>     *** No algorithm exists to provide clear guidance about which policies in which proportions justify the imposition of an affirmative duty based on a relationship. The special relationships established by this Section are justified in part because the reasons for the no-duty rule in § 37 are obviated by the existence of the relationship. *** In addition, some relationships necessarily compromise a person's ability to self-protect, while leaving the actor in a superior position to protect that person. Many of the relationships also benefit the actor." *Id.* § 40, cmt. h.

See also *id.* § 40, Reporter's Note, cmt. h ("Courts frequently rely on the differential capacity for protection resulting from the relationship as a justification for finding the relationship to be special. *** That a defendant derives a commercial advantage from the relationship has also been influential in the identification of special relationships.").

¶ 99 The relationship between the national organizations and pledges like David appears to check both boxes. Though the relationship between national organizations and their pledges has been termed "fraternal" and "a fellowship of equals" (*Sullivan*, 572 A.2d at 1213), the reality is quite different; it is coercive and financial. As the plaintiff has alleged, the national organizations were engaged in the business of recruiting new members and derived most of their income from fees paid by members and pledges. See *Kenner*, 2002 PA Super 269, ¶ 15 (stating that the relationship between a national fraternity and prospective member "is, at a minimum, contractual in nature, requiring performance by both parties"). The national organizations also dictated the contents of the pledgeship and initiation process, encouraging events such as "Mom & Dad's Night" because they served the dual goals of recruitment and

retention. To pledges like David, that event was mandatory, a prerequisite for membership. Seeking the prestige of what being a Pi Kappa Alpha meant, as well as housing for the following school year, pledges put themselves at the mercy of the fraternity. And in doing so, they became unable to protect themselves. See *Krueger v. Fraternity of Phi Gamma Delta, Inc.*, No. 004292G, 2001 WL 1334996, at *3 (Mass. Super. Ct. 2001) (accepting the plaintiff's argument that the national organization "had a strong interest in recruiting new pledges to bolster its ranks and that this, combined with [the plaintiff's decedent's] need for university housing and desire to become a fraternity brother, created a situation where he was pressured or coerced into performing the fraternity rituals" that killed him); *Oja v. Grand Chapter of Theta Chi Fraternity Inc.*, 667 N.Y.S.2d 650, 652 (Sup. Ct. 1997) (stating that no moral "revulsion seems justified" against imposing liability "in relation to the injuries and deaths sustained by adolescents who, however unwisely, trade their insecurities and free will for the promise of acceptance, and prestige, that fraternity membership appears to confer"); *Thomas v. Lamar University-Beaumont*, 830 S.W.2d 217, 219 (Tex. Ct. App. 1992) (reversing the trial court's summary judgment order in favor of the national organization, stating that the organization "clothed its members with the indicia of a fraternal organization and a mystique powerful enough to entice adult university students to run around a building carrying cups or brand Greek letters on their bodies"); see also *Ballou*, 352 S.E.2d at 496 (concluding that the plaintiff "placed himself at the local chapter's disposal on hell night only because he wanted to become an active brother" of the national organization). "[T]he more prestigious the fraternity, the greater the pressure applied to the pledge seeking admission, and the more culpable the national fraternity in donating its good name to be used to convince pledges to submit themselves to the very activities that caused them injury—implicating the national directly." Jared S. Sunshine, *A Lazarus Taxon in South Carolina: A Natural History of National Fraternities'* Respondeat Superior *Liability for Hazing*, 5 Charlotte L. Rev. 79, 127 (2014); *cf. Haben v. Anderson*, 232 Ill. App. 3d 260, 266 (1992) (stating that when club membership is a "much valued status" and "great pressure" is applied to comply with *de facto* membership qualifications, a college student may be "blinded to the dangers he was facing"); *Quinn*, 155 Ill. App. 3d at 237 (highlighting the "high esteem" in which a fraternal organization is held).

¶ 100   Thus, if the plaintiff had made that argument, I may well have concluded that the relationship between the national organizations and pledges like David was akin to other special relationships so as to justify imposing a duty on the national organizations. Again, that conclusion remains conditional because I do not know how the national organizations would have responded. To reiterate: The parties did not brief any issues surrounding the special relationship doctrine. Our analytical attention would be better spent elsewhere.

¶ 101                    *Simpkins* and the Four Traditional Duty Factors

¶ 102   Any speculation as to arguments that the parties may have made under the special relationship doctrine is not only unwise (Sunshine, *supra*, at 130 ("the 'special relationship' approach *** creates powerfully perverse incentives for the national [organization] to be derelict in its duties")) but also unnecessary.

¶ 103   Comment e to section 302B of the Second Restatement teaches:

"There are *** situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In

- 28 -

general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; *or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account.*" (Emphasis added.) Restatement (Second) of Torts § 302B cmt. e (1965).

See *id.* § 302B, cmt. e, illus. D ("Where the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for misconduct.").

¶ 104    A fair reading of counts I and II of the plaintiff's complaint reveals that he alleges the national organizations, through their own affirmative acts or omissions, contributed to the risk of harm that ultimately killed David. Specifically, the plaintiff alleges that the national organizations "[p]ermitted and allowed dangerous pledge events being undertaken by local *** chapters, including [the NIU Chapter], which required excessive and dangerous consumption of alcohol to the point of insensate intoxication in violation of the [Hazing Act];" "[f]ailed to warn local *** chapters, including [the NIU Chapter,] about the dangers and risks of required alcohol related pledge events, although it knew, or should have known such rituals are often fatal;" "[f]ailed to adopt reasonable and effective policies to be followed by its local fraternity chapters, including [the NIU Chapter], to prevent dangerous pledge events and activities involving excessive required and dangerous consumption of alcohol to the point of insensate intoxication;" "[f]ailed to take reasonable steps to [ensure] its local chapters, including [the NIU Chapter], followed policies and procedures it claimed to have adopted regarding required pledge events and activities;" "[f]ailed to take reasonable steps to learn whether its local chapters, including [the NIU Chapter] were following policies and procedures limiting required initiations it claimed to have adopted;" "encouraged local chapters, including [the NIU Chapter,] to hold events similar to 'Mom and Dad's Night' because they were good for member and pledge retention, therefore increasing revenue and income to the defendants through due and fees;" "[f]ailed to ban pledging events and activities outright at all of its local chapters[,] although they knew pledge events and activities were likely to result in bodily harm and death to fraternity pledges;" and "[f]ailed to take necessary and appropriate steps within [their] rights and powers to [ensure] [the NIU Chapter] implemented a continuing risk education policy and functioning risk awareness committee," despite their knowledge through annual inspections and audits by their chapter consultants that the NIU Chapter had not had such a committee or a risk awareness program for at least three years before David's death.

¶ 105    In short, the plaintiff's allegations against the national organizations are all aimed at risk, and the risk to which they purportedly contributed—bodily injury or death following the forced consumption of alcohol at membership activities encouraged and perhaps required by the organizations—was one that ultimately took a college freshman's life. In sum, the plaintiff asserted that the national organizations, by their own acts or omissions, contributed to a risk of harm to David. The answer to *Simpkins*'s threshold question is yes, and the proper analysis *vis-à-vis* the national organizations involves not special relationships but the four traditional duty factors. That is how the parties presented this case to us, and it is how the majority should have analyzed it. I suspect the majority's inexplicable refusal to engage the parties' arguments

in this regard stems from a recognition that they lead unavoidably to one result: The plaintiff has sufficiently pleaded that the national organizations owed a duty to David.

¶ 106 The majority concedes that the first two factors—the foreseeability and the likelihood of the plaintiff's injury—are present in this case. According to the majority, the existence of hazing statutes across the country, including our own, as well as the national organizations' written policy against hazing, "indicates that injury due to hazing is reasonably foreseeable." *Supra* ¶ 46. And such injuries, particularly when the hazing involves forced consumption of alcohol, "are likely to occur." *Supra* ¶ 46. The majority continues, "When pledges are required to consume large quantities of alcohol in short periods of time, their risk of injury is great—not only physical injury due to their inebriated condition but injury or death resulting from alcohol poisoning." *Supra* ¶ 46.

¶ 107 The second two factors—the magnitude of the burden to guard against the plaintiff's injury and the consequences of placing that burden on the defendant—also weigh in favor of finding that the national organizations owed a duty of care. To some extent, the national organizations have already shouldered a large part of the burden to protect pledges like David via their antihazing policies, risk management education initiatives, and chapter monitoring programs that the plaintiff outlined in the complaint. Thus, the burden of shouldering a duty of reasonable care for the benefit of pledges like David is not unreasonable. See *Edwards*, 1999 WL 1069100, *7 ("It does not seem unduly burdensome to impose some duty on the national organization of a fraternity to guard, to some extent, against hazing based violence.").

¶ 108 The consequence of placing the burden of a duty on the national organizations cuts both ways. Of course, one consequence would be the expense incurred by the national organizations. Another consequence would be a decrease in hazing and accompanying injuries and deaths. The prevalence of Greek-letter organizations on college campuses actually makes the latter consequence more important.

¶ 109 "There is a Grand Canyon-size chasm between the official risk-management policies of the fraternities and the way life is actually lived in countless dangerous chapters." Flanagan, *supra*. National organizations across the country portray themselves as mildly interested onlookers, extolling certain virtues and establishing certain standards to guide their members. Pi Kappa Alpha, like many national organizations, has adopted a strongly worded antihazing policy. See *Position on the Pi Kappa Alpha Fraternity Standards*, The Pi Kappa Alpha International Fraternity, Inc. (2010), https://www.pikes.org/~/media/pikes_org/images%20 and%20documents/about%20pike/6-1%20values%20position%20and%20relationship%20 statements/resolution%20on%20hazing.ashx; *The Pi Kappa Alpha International Fraternity Standards*, https://www.pikes.org/~/media/pikes_org/images%20and%20 documents/about%20pike/6-1%20values%20position%20and%20relationship%20statements /standards%202016.ashx?la=en (last visited Jan. 16, 2018). That policy indicates that the national organizations have recognized the problem of hazing and have taken concrete steps to address it.[11] Through their chapter consultants, the organizations can even gauge whether local

---

[11]The national organizations, in their "FRATERNITY STANDARDS," try to have the best of both worlds. They state that each chapter shall abide by certain rules "as a condition of its charter as a chapter in good standing with the Fraternity" and that each member also shall abide by those rules "as a condition to maintain his membership in good standing with the chapter." *The Pi Kappa Alpha International Fraternity Standards*, https://www.pikes.org/~/media/pikes_org/images%20and%20

chapters and their members are observing the antihazing policy and following the risk management manual. Yet, as shown by the tragedy in this case, the national organizations' enforcement of their own rules has been lax. Perhaps that is by design. See Coolidge, *supra* n.6, at 921 ("[T]he public generally does not realize the extent to which national organizations go to prevent liability. National organizations have learned what subjects them to liability and have evolved in response.").

¶ 110    Universities in the Midwest—Indiana University, the University of Iowa, the University of Michigan, the Ohio State University, and the University of Iowa—and beyond—Florida State University, Louisiana State University, Penn State University, and Texas State University—recently have taken matters into their own hands, suspending or highly regulating Greek activities on campuses across the country. Anemona Hartocollis, *No Wild Parties, No Pledging as Universities Crack Down on Fraternity Excesses*, N.Y. Times, Dec. 15, 2017, https://www.nytimes.com/2017/12/15/us/fraternities-deaths-crackdown.html. Such initiatives are welcome but misplace responsibility for fixing a Greek system spinning wildly out of control due to surging membership and anemic oversight from headquarters.[12]

¶ 111    The national organizations suggest that "[t]here is nothing absurd about compelling each of those hundreds of chapters to manage its own affairs, and members." There is also nothing absurd about compelling the national organizations, whose very existence flows from the influx of new members, to exercise reasonable care on their behalf. The plaintiff's complaint asserts that the national organizations owed David "a duty to prevent the foreseeable consequences of required excessive consumption of alcohol during [an] initiation ritual." Imposing such a duty on the national organizations to exercise reasonable care with respect to pledge events would "meaningfully reduce the risk" of deaths or injuries from hazing by forced consumption of alcohol. Such a duty would not require the national organizations to maintain continuous contact with local chapters or to become a central planning and policing authority. Such a duty also would not require the national organizations to control the day-to-day operations of local chapters. That duty would simply require them to enforce their own rules for a few membership and initiation activities per school year—activities where

---

documents/resources/general/ standards%20with%20acknowledgment.ashx?la=en (last visited Jan. 16, 2018). The standards later provide, "It should be understood that the Fraternity DOES NOT and CANNOT oversee, monitor, supervise[,] or direct the daily or any other activity of hundreds of chapters and thousands of members located throughout the United States and Canada." *Id.*; see also *The Pi Kappa Alpha International Fraternity Standards,* https://www.pikes.org/~/media/pikes_org/ images%20and%20documents/resources/general/standards%20with%20acknowledgment.ashx?la=en (last visited Jan. 16, 2018) (defining the relationship between the national organizations and local chapters).

[12]Notably, a criminal court in Pennsylvania earlier this month convicted a national organization of eight felonies in connection with a hazing death in 2014. See *Commonwealth v. Pi Delta Psi*, No. CP-45-CR-2578-2015 (Ct. Com. Pl. Monroe County, Pa.) (docket summary available at https://ujsportal.pacourts.us/DocketSheets/CourtSummaryReport.ashx?docketNumber=CP-45-CR-00 02578-2015 (last visited Jan. 16, 2018)). That organization was fined more than $110,000 and barred from operating in the state as a condition of its probation. Rick Rojas, *Fraternity Is Banned From Pennsylvania After Student's Hazing Death*, N.Y. Times, Jan. 8, 2018, https://www.nytimes.com/ 2018/01/08/nyregion/fraternity-pennsylvania-hazing-death-baruch-college.html.

hazing (a violation of state law) and the consumption of alcohol by minors (also a violation of state law) are probable and the dangers that arise when the two mix are well known.[13]

¶ 112    Hazing is not going away on its own. The lessons that should have been learned from generations of deaths have been largely ignored, except by the families of the victims. See Coolidge, *supra*, at 923 ("National organizations have the resources and ability to reform their local chapters, but incidents continue and the consequences often fall on their local chapters and individual members."). In fact, one study has documented at least one college hazing death every year since 1961. See Hank Nuwer, *Hazing Deaths*, Hank Nuwer's Hazing Clearinghouse (last updated Jan. 14, 2018), http://www.hanknuwer.com/hazing-deaths/. Unfortunately, David was one of three fraternity hazing deaths in 2012. See *List of Hazing Deaths in the United States*, Wikipedia, https://en.wikipedia.org/wiki/ List_of_hazing_deaths_ in_the_United_States#2010s (last visited Jan. 18, 2018). There have been more, including four in 2017. See Sheryl Gay Stolberg, *18 Penn State Students Charged in Fraternity Death*, N.Y. Times, May 5, 2017, https://www.nytimes.com/2017/05/05/us/penn-state-fraternity-death-timothy-piazza.html; Travis M. Andrews, *LSU Freshman Dies After "Potential Hazing Incident" at Fraternity, Police Say*, Wash. Post, Sept. 15, 2017, https://www. washingtonpost.com/news/morning-mix/wp/2017/09/15/lsu-freshman-dies-after-potential-hazing-incident-at-fraternity-police-say/; Sarah Larimer, *Florida State Suspends Fraternities, Sororities in Wake of Pledge's Death*, Wash. Post, Nov. 6, 2017, https://www.washingtonpost.com/news/grade-point/wp/2017/11/06/florida-state-suspends-fra ternities-sororities-in-wake-of-pledges-death/; Maggie Astor, *Texas State Halts Greek Activities After Fraternity Pledge Dies*, N.Y. Times, Nov. 14, 2017, https:// www.nytimes.com/2017/11/14/us/texas-state-greek-life.html. And the facts of those cases are eerily familiar: death from forced consumption of alcohol at pledge events, or what the national organizations in their brief blithely call "physical discomfort through the use of alcohol."

¶ 113    The national organizations' insistence that they garner "no benefit from hazing" glosses over the fact that they do benefit from pledging. And if hazing is a foreseeable part of the pledging and initiation process, then the national organizations should carry some responsibility for protecting against it. Our duty analysis involves balancing. I would strike the balance here in favor of young people like David. In my view, the foreseeability and likelihood of the injury here outweigh the burden and consequence of placing a duty of reasonable care on the national organizations for the benefit of pledges. I would reverse the trial court's decision to dismiss the plaintiff's claims against the national organizations and remand for further proceedings.

¶ 114    For the reasons that I have stated, I concur in part and respectfully dissent in part.

¶ 115    JUSTICE KILBRIDE joins in this partial concurrence and partial dissent.

---

[13]Pi Kappa Alpha's Wikipedia page contains a list of misconduct allegations, each with a citation to a news source, many of which involve hazing, alcohol abuse, or both. See *Pi Kappa Alpha*, Wikipedia, https://en.wikipedia.org/wiki/Pi_Kappa_Alpha#Misconduct_allegations (last visited Jan. 16, 2018). David's death is on the list. *Id.* (citing Barbara Vitello, *Father of NIU Frat Hazing Victim Tells 22 Convicted, 'You Left Him Alone to Die,'* Daily Herald, May 8, 2015, http://www.dailyherald.com/ article/20150508/news/150508898/).